| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE ST. JOSEPH SUPERIOR/CIRCUIT COURT |
| | ) | |
| ST. JOSEPH COUNTY | ) | CAUSE NO. 71___-1712-PL-_____ |

**71D05-1712-PL-000464**

|  |  |
|---|---|
| 1ST SOURCE BANK | ) |
| 100 N. Michigan Street | ) |
| South Bend, IN 46601, | ) |
|     Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) |
| MINNIE MOORE RESOURCES, INC. | ) |
| c/o Carl Johnston, President | ) |
| 350 Broadford Rd. | ) |
| Bellevue, ID 83313, | ) |
| | ) |
| CARL JOHNSTON | ) |
| 3154 Sorrell St. | ) |
| Las Vegas, NV 89146, | ) |
|       Defendants. | ) |

## COMPLAINT

COMES NOW Plaintiff 1st Source Bank ("Plaintiff"), by counsel, and states the following causes of action for judgment on the note, guaranty, foreclosure, and other relief:

## PARTIES

1.     Plaintiff is a corporation organized under the laws of the state of Indiana having its principal place of business in South Bend, Indiana.

2.     Upon information and belief, Defendant Minnie Moore Resources, Inc. ("Minnie Moore") is a corporation organized under the laws of Nevada.

3.     Upon information and belief, Defendant Carl Johnston ("Johnston") is an adult resident of Las Vegas, Nevada.

**JURISDICTION/VENUE**

4.      Jurisdiction over Defendants is proper as the Loan Documents (hereinafter defined) were executed in Indiana and contain forum selection clauses, by which Defendants consented and submitted to jurisdiction in a court of competent jurisdiction located in the County of St. Joseph, Indiana.

5.      Venue is proper in accordance with Indiana Trial Rule 75, and pursuant to agreement among the parties.

**CAUSES OF ACTION**

**COUNT I**
(Judgment on the Note)

6.      Plaintiff realleges and incorporates by reference paragraphs 1 through 5 above as if fully set forth herein.

7.      On or about September 21, 2017, Minnie Moore executed a Loan and Security Agreement in favor of Plaintiff (the "Loan and Security Agreement"). A true and accurate copy of the Loan and Security Agreement is attached hereto, marked as Exhibit "A," and made a part hereof.

8.      Pursuant to the Loan and Security Agreement, on or about September 21, 2017, Minnie Moore executed a Promissory Note – Term in favor of Plaintiff in the original principal amount of Three Hundred Fifty Thousand Eight Hundred and 00/100 Dollars ($350,800.00) (the "Note"). A true and accurate copy of the Note is attached hereto, marked as Exhibit "B," and made a part hereof.

9.      Pursuant to the terms of the Loan and Security Agreement and the Note (collectively, the "Loan Documents"), upon the occurrence of an event of default, all or any part

of the entire indebtedness represented by the Note, at the option of Plaintiff, shall become immediately due and payable without notice or demand.

10.     Minnie Moore has defaulted on the Note by, among other things, failing to pay amounts due and owing.

11.     As of December 6, 2017, the amount due and owing under the Loan Documents from Minnie Moore to Plaintiff totaled Three Hundred Fifty-Nine Thousand Nine Hundred Forty-Three and 40/100 Dollars ($359,943.40). Interest continues to accrue thereon at a rate of Forty-Five and 82/100 Dollars ($45.82) per diem.

12.     By letter dated December 5, 2017, notice was given to Minnie Moore that it was in default under the Loan Documents.

13.     Despite notice of the default, Minnie Moore has failed to cure said default.

14.     Because of Minnie Moore's default on its obligations, Plaintiff has been required to hire counsel to collect the debt and file this action.

15.     Under the terms of the Loan Documents, Minnie Moore is obligated to Plaintiff for all expenses and attorneys' fees incurred by Plaintiff in collecting on the obligations.

## COUNT II
(Judgment on the Guaranty)

16.     Plaintiff realleges and incorporates by reference paragraphs 1 through 15 as if fully set forth herein.

17.     On or about September 21, 2017, Defendant Carl Johnston executed a Guaranty of Payment pursuant to which he unconditionally guaranteed all indebtedness and obligations owed by Minnie Moore to Plaintiff (the "Guaranty"). A true and accurate copy of the Guaranty is attached hereto, marked as Exhibit "C," and made a part hereof.

18.     Pursuant to the terms and provisions of the Guaranty, Johnston agreed to make prompt payment in the event of a default by Minnie Moore upon its obligations.

19.     As set forth in Count I, Minnie Moore defaulted on the Loan Documents by reason of its failure, and continuing failure, to pay amounts when and as due to Plaintiff under the terms of the Note.

20.     On or about December 5, 2017, Johnston received notice of Minnie Moore's default.

21.     Notwithstanding notice of the default, Johnston failed to cure such defaults and since such notice of default was sent, has not made any payments to Plaintiff as required by the Guaranty.

22.     As of December 6, 2017, the amount due and owing under the Loan Documents from Minnie Moore and Johnston to Plaintiff totaled Three Hundred Fifty-Nine Thousand Nine Hundred Forty-Three and 40/100 Dollars ($359,943.40). Interest continues to accrue thereon at a rate of Forty-Five and 82/100 Dollars ($45.82) per diem.

23.     As a result of Minnie Moore's default, and Johnston's failure to satisfy its obligations, Plaintiff is forced to maintain this action and incur costs and attorney fees.

24.     Pursuant to the terms of the Guaranty, Plaintiff is entitled to recover costs and attorneys' fees in addition to the amount guaranteed.

## COUNT III
### (Foreclosure of Security Interest)

25.     Plaintiff realleges and incorporates by reference paragraphs 1 through 24 as if fully set forth herein.

26.     Under the terms of the Loan and Security Agreement, Minnie Moore granted Plaintiff a first-priority security interest in certain equipment, including but not limited to, a

Grizzly Screen; Extec Track Mounted Jaw Crushing Plant; Extec Track Mounted Screening Plant, and all electrical boxes, controls, cabinets, wiring, cable, transformers, lights, meters, soft starts, stops, pipe, pumps, and any and all electrical components necessary to operate the equipment/convey; and all proceeds of the equipment (collectively, the "Collateral").

27.     Plaintiff properly perfected its security interest in the Collateral.

28.     Pursuant to the terms of the Loan Documents and applicable law, Plaintiff is entitled to foreclose its security interest against the Collateral, to take immediate possession, dispose of, and/or sell the Collateral, and to apply the proceeds from said sale, or the amounts so collected, to Plaintiff's expenses and to the obligations secured by the Loan Documents.

29.     Plaintiff has a first, perfected security interest in, and to, the Collateral.  Upon information and belief, the foreclosure and lien rights of any other person or entity whose interest in, or lien upon, the Collateral is sought to be terminated in this action.

## COUNT IV
(Replevin/Immediate Possession of Property)

30.     Plaintiff realleges and incorporates by reference paragraphs 1 through 29 above as if fully set forth herein.

31.     Plaintiff is entitled to immediate possession and delivery of the Collateral and has the right to sell the Collateral to offset the balance owed, and for a deficiency judgment for the balance remaining after the proceeds of the sale are applied to the balance owed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff 1st Source Bank, by counsel, prays for the following relief:

A.     For judgment in its favor and against Defendants Minnie Moore Resources, Inc. and Carl Johnston, jointly and severally, in the amount of Three Hundred Fifty-Nine Thousand Nine Hundred Forty-Three and 40/100 Dollars ($359,943.40) plus

prejudgment interest, post-judgment interests, its reasonable attorneys' fees and the costs of this action;

B.      For an Order of the Court: (1) declaring that Plaintiff has a valid, first-priority security interest in the Collateral; (2) granting Plaintiff immediate possession of the Collateral; and (3) entitling Plaintiff to foreclose on its security interest in the Collateral; and

C.      All other just and proper relief.


                    */s/ Jennifer L. ElBenni*
                    Jeffery A. Johnson (5009-71)
                    Jennifer L. ElBenni (27825-71)
                    Attorneys for Plaintiff

                    **MAY • OBERFELL • LORBER**
                    4100 Edison Lakes Parkway, Suite 100
                    Mishawaka, IN  46545
                    Phone: (574) 243-4100
                    Fax: (574) 232-9789



# MODIFICATION ADDENDUM

This Modification Addendum is a part of the Loan and Security Agreement dated September 21, 2017 ("Agreement") between MINNIE MOORE RESOURCES, INC. ("Customer") and 1st Source Bank ("Bank").

1.   The following provisions in the Agreement are hereby modified to read as follows:

   **Paragraph 3 Customer represents and warrants that:**

   (a)   Customer is a corporation organized and in good standing under the laws of Nevada, and in good standing in all jurisdictions where qualification is necessary;

2.   All other provisions of the Agreement remain in effect as written.

Executed by Customer on September **25**, 2017

**MINNIE MOORE RESOURCES, INC.**

By: _____ president
   Carl Johnston, President

**1st SOURCE BANK**

By: _____
   Lisa Dutoi, Asst. Portfolio Manager

Exhibit "A"

**1st Source Bank**

# LOAN AND SECURITY AGREEMENT

**Document Date:** September 21, 2017

| Customer (Exact Legal Name): | MINNIE MOORE RESOURCES, INC. | |
|---|---|---|
| **Address:** | 350 Broadford Rd | |
| **City/State/Zip Code:** | Bellevue, ID 83313 | |
| **Phone:** (208) 928-4346 | **Fax:** | **Email:** |

1. 1st Source Bank ("Bank") has agreed to lend money to the individual or entity identified above as the "Customer", and may agree to lend additional money to Customer from time-to-time. The principal amount, the interest rate, payment amount, payment due dates, the maturity date and other particulars for each loan shall be set forth in a promissory note, addendum, schedule or other separate document containing such terms (each a "Note"). Customer will make payments when due and payable without offset, defense or counterclaim. All payments will be given tentative credit when received by Bank in Indiana and posted to Customer's account in accordance with standard Bank practices, subject to final collection. All final payments shall be made in immediately available collected funds unless Bank agrees otherwise. All payments shall be applied first to interest, then to principal unless otherwise provided in this Agreement. Interest shall accrue based on a 360-day year and the days actually elapsed.

2. To secure repayment of the loans and performance of the other obligations of Customer under this Agreement, and also to secure all other monetary and non-monetary obligations of Customer to Bank under any other agreement, whether absolute or contingent, direct or indirect, now existing or hereafter arising, Customer grants to Bank a continuing security interest in the "Collateral" as defined in the following sentence. "Collateral" means the aggregate of (a) the property described in any addendum, schedule or other separate document that, by its terms, is made a part of this Agreement; plus (b) any other assets of Customer in which Customer has granted Bank a security interest under any other existing or future agreement, whether or not related to this Agreement. If the property included in Collateral is equipment (whether or not held as inventory)("Equipment"), then Collateral also includes (i) all logs, records and manuals relating to the Equipment, (ii) all present and future attachments, accessories, parts, repairs, additions, accessions, substitutions, exchanges and replacements identified with or relating to the Equipment; (iii) all present and future rights of Customer relating to the physical condition of the Equipment, including under any warranties, service or maintenance agreements, storage agreements or insurance policies; (iv) all present or future rights of Customer in connection with the use and/or operation of the Equipment by any third party under any lease, rental agreement or license; and (v) proceeds of the Equipment and any of (i) through (iv).

3. Customer represents and warrants that:

   (a) Customer is a corporation organized and in good standing under the laws of Idaho, and in good standing in all jurisdictions where qualification is necessary;

   (b) if applicable, the execution and delivery hereof, and all other agreements or writings by and between Customer and Bank have been duly authorized by appropriate action of Customer's governing body;

   (c) Customer is the absolute owner of the Collateral and has full power and authority to grant a security interest in the Collateral to Bank;

   (d) the Collateral is free and clear from all liens, encumbrances, security interests, or other claims other than the security interest of Bank;

   (e) none of the terms of this Agreement or any other agreements between Customer and Bank are in violation of any agreements Customer may have with any third party;

   (f) all financial statements, credit applications, and other information Customer has provided to Bank are truthful and accurate, and all financial statements and other information Customer delivers or provides to Bank in the future also will be truthful and accurate;

   (g) since the date of the most recent financial statements delivered to Bank, there has been no material adverse change in Customer's financial condition or prospects;

   (h) Customer understands and acknowledges that Bank is neither the manufacturer nor distributor of the Equipment and has no knowledge of or familiarity with it. Customer will be accepting the Equipment "as is" and Bank has not made, and will not make, any representation or warranty, express or implied, as to the value, condition, quality, material, workmanship, design, capacity, merchantability, durability, fitness or suitability of the Equipment for any use or purpose, or any other representation or warranty whatsoever, express or implied; and

   (i) Customer acknowledges that by requiring insurance herein (or in the insurance letter) as provided below, Bank does not represent that coverage and limits will necessarily be adequate to protect Customer and such coverage and limits shall not be deemed as a limitation on Customer's liability under Customer's indemnities otherwise set forth in this Agreement.

4. Customer will, at its own cost and expense as applicable:

   (a) deliver to Bank from time-to-time its financial statements, in the same form and type as submitted with Customer's loan request. Customer will deliver its full-year annual financial statements each year as soon as available, but in any event not later than one hundred twenty (120) days after the close of each of its fiscal years, together with the opinion or other report of the accountant(s) (if

any) retained to compile, review or audit the financial statements. Bank may specify a different form, type or frequency in any addendum, schedule or other separate document that, by its terms, is made a part hereof, or as Bank may reasonably request in any written notice delivered by Bank to Customer;

(b) promptly deliver to Bank such other information and documents regarding the loans, the Collateral, and the business affairs, operations, financial condition or other properties of Customer as Bank may reasonably request from time-to-time;

(c) at all times insure the Collateral with companies acceptable to Bank against loss, collision, theft, vandalism, or other physical damage, liability and other risks and hazards, as Bank reasonably requires, giving due consideration to the kinds of coverage that owners of the property-type(s) included in the Collateral commonly obtain, for an amount(s) not less than the amount(s) set forth in an "Insurance Letter" delivered by Bank to Customer or Customer's insurance agent in connection with any of the Collateral, under policy(ies) of insurance that include a standard long form, loss payable endorsement in favor of Bank, "breach of warranty" or similar coverage against any acts, omissions or neglect by Customer or any other party (other than Bank) that otherwise would negate coverage under such policy(ies), and the insurer's agreement to give written notice to Bank thirty (30) days (or such lesser period as Bank may reasonably accept) before cancellation of or any material change to any such policy(ies) becomes effective as to Bank, whether such cancellation or change is at the request or direction of Customer or the insurer, provided however, that Bank may from time-to-time, upon written notice to Customer, modify or add other insurance requirements so that the scope and amount of coverage required hereunder is consistent with best industry practice and the reasonable commercial interests of Bank; and will deliver to Bank certificates of insurance or other evidence reasonably satisfactory to Bank of compliance with the foregoing insurance requirements;

(d) keep the Collateral safe and secure, in good order, repair, operating condition and appearance, use and operate the Collateral with care and only with qualified personnel in the ordinary course of Customer's business and in conformity with all laws and regulations, keep accurate and complete records concerning the Collateral, and maintain and use the Collateral within the United States unless Customer obtains the Bank's prior written consent to move the Collateral;

(e) pay when due any tax, assessment, levy or charge on or against the Collateral by any governmental authority or other third party, and not suffer or permit, and promptly remove or cause to be removed, any lien, encumbrance, claim, security interest, mechanic's lien, levy, attachment or other interest of any individual or entity other than Bank upon or against the Collateral, except for any of the foregoing that Customer is contesting in good faith;

(f) permit Bank, at all times during business hours, to inspect all or any portion of the Collateral, wherever located, and to inspect, audit, check, and make copies of or extracts from, Customer's books, records, correspondence and other data relating to Customer's financial condition or the Collateral;

(g) do all such acts and execute all instruments, financing statements or other documents as reasonably requested by Bank for the purpose of fully carrying out and effectuating this Agreement and its intent or which Bank reasonably deems necessary to protect the Collateral or perfect the security interests granted herein;

(h) not mortgage, sell, lease, transfer, set over, abandon, assign, grant a security interest in, permit its identity to be lost, or otherwise dispose of Collateral or any interest therein or any part thereof, except as may be provided in any applicable addendum, schedule or other separate document that, by its terms, is made part of this Agreement; and

(i) advise Bank within thirty (30) days of any change of Customer's name, location of principal office or residence or form of business entity.

5. Other monetary obligations of Customer hereunder include the following:

(a) If Customer is ten (10) days late in making a payment, then Customer shall pay a delinquency charge equal to five percent (5%) of the amount of the late payment (both principal and interest), and Bank shall assess such delinquency charge on the tenth (10th) calendar day after the payment due date. After a default as defined below has continued for 30 days and as long as the default continues, Bank may by notice of default charge interest at the rate set forth in the applicable Note plus three percent (3%) per annum (the "Default Rate"). If imposed, the Default Rate shall apply retroactively to the date the default began.

(b) Customer also shall pay to Bank, or if requested by Bank, directly to the applicable vendor or other third party, any fees, costs, expenses, penalties or interest incurred by Bank in connection with this Agreement, any Note or any of the Collateral, including without limitation, fees, costs or expense of: (i) filing, registering or recording this Agreement and Bank's interests under this Agreement, or any UCC financing, continuation or termination statement or similar official filings or registrations, (ii) any transfer or stamp taxes, (iii) inspection, appraisal or monitoring of the Collateral as Bank may conduct for itself or obtain from a third party in its discretion, (iv) exercising its rights herein or under applicable law to protect its interest in the Collateral by performing obligations of Customer in the event Customer fails to timely perform same, (v) taking possession of, holding, preparing for sale or other disposition and selling or otherwise disposing of the Collateral, and (vi) all attorneys' and other professionals retained by Bank in connection with any of the foregoing, or any exercise of other remedies upon occurrence of a default, whether such fees, costs or expenses are incurred before or after commencement of any bankruptcy case or other insolvency proceeding. All of the foregoing fees, costs or expenses thus incurred or expended by Bank, and any other monies paid by Bank to collect Customer's obligations under any Note or protect its interests in the Collateral shall, at Bank's option, for each instance of fees, cost or expense so incurred or paid by Bank, either be added to the balance of the applicable Note or if more than one Note, then pro-rated among the Notes, and be subject to all of the provisions of this Agreement, or be paid immediately by Customer upon demand by Bank, with interest accruing on the amount so demanded at the Default Rate.

(c) Customer will at all times be liable to and indemnify and hold Bank harmless from and against any and all claims and liabilities on account of death, bodily injury or property damage occasioned by the use or ownership of Collateral.

6.  Customer will be in default if any one or more of the following events takes place:

    (a)  Customer fails to make any payment when due under (i) this Agreement, (ii) any Note, (iii) any addendum, schedule or other separate document delivered by Customer or Bank that relates to this Agreement, or (iv) under any other agreement between Customer and Bank;

    (b)  Customer fails to make payment when due or otherwise fails to perform under any agreement for borrowed money, or any obligation of Customer for borrowed money is declared due and payable before its original maturity date;

    (c)  Customer or any guarantor fails to perform any obligation under this Agreement or any Note, any addendum, schedule or other separate document that, by its terms, is made a part hereof, any guaranty, or under any other agreement between Customer and Bank, provided, however, that, to the extent any such obligation, other than a payment or insurance obligation, can still be performed, such failure continues for more than ten (10) business days after delivery by Bank of a written demand to perform;

    (d)  any representation or warranty made by Customer in this Agreement is false in any material respect when made, or subsequently becomes no longer true (except for representations and warranties that become untrue solely due to the passage of time);

    (e)  Customer, or any guarantor of Customer's obligations to Bank, dies, dissolves, merges with another entity, suspends or terminates his/her/its usual business, is unable to pay his/her/its debts as they become due, makes an assignment for the benefit of creditors, applies to any court for the appointment of a trustee or a receiver of all or a substantial part of his/her/its assets or commences any proceeding under any bankruptcy, receivership, insolvency, dissolution or liquidation law of any jurisdiction, or any other individual or entity commences such proceedings against Customer or any such guarantor and Customer or such guarantor acquiescence thereto, or denies liability to Bank or seeks to terminate any agreement with Bank;

    (f)  Bank, in good faith, believes that the prospect of payment and performance hereunder has substantially diminished or that there is a material adverse change in the financial condition or operations of Customer or any guarantor, including garnishing of or levying on any accounts with Bank; or

    (g)  Customer's principals as of the inception of this Agreement no longer control or operate the business of Customer.

7.  Upon the occurrence of any of the foregoing events of default and at any time thereafter that any event of default is continuing, Bank may do any or all of the following, cumulatively: (i) declare all or any part of the remaining unpaid indebtedness of Customer to Bank to be immediately due and payable, together with all unpaid interest and any other accrued and unpaid monetary obligations of Customer hereunder; (ii) exercise all rights and remedies provided in this Agreement, under the Uniform Commercial Code as in effect in all pertinent jurisdictions and under any other applicable law, treaty or convention, including without limitation the right: (a) to immediate possession of all or a portion of the Collateral, (b) to require Customer to assemble the Collateral and deliver it to Bank at a place designated by Bank that is reasonably convenient to both parties, (c) to enter upon any premises on which Collateral or any portion thereof may be located and take possession of same, at any time or times, with or without demanding delivery, with or without judicial process, and with or without the assistance of others, (d) to dispose of Collateral on any premises, including those of Customer, (e) to setoff any property of Customer in the possession or control of Bank, and (f) in Bank's sole discretion, to undertake payment or other performance of any obligation of Customer hereunder that Customer has failed to perform.

    In connection with any sale or other disposition of the Collateral by Bank, the requirements of reasonable notice shall be met if such notice is given to Customer and any guarantors at least ten (10) days before the date of any public or private sale or other disposition of Collateral is to be made.

    Customer's obligation to repay each Note and all other obligations of Customer hereunder are independent of the obligation of any other individual or entity that has signed this Agreement or other documents as a Customer or a guarantor ("Signer(s)"). It is not necessary for Bank to exercise its rights and remedies in respect of the Collateral before collecting from a Signer. Bank may extend the time for payment of any installment, reduce the size of monthly payments, release Collateral, release one or more Signers from their obligations, waive any right Bank might have against any Signer, extend, renew or agree to alter this Agreement, all without releasing other Signers from their obligations under this Agreement or any guaranty agreement. Any delay by Bank in exercising any rights or remedies hereunder or under any other instrument executed and delivered by Customer to Bank in connection herewith shall not operate as a waiver thereof and no single or partial exercise of any right or remedy shall preclude other or further exercise thereof, or the exercise of any other right or remedy. Bank's acceptance of late or partial payments, or waiver of any default, shall not establish a custom or course of conduct and the waiver by Bank of any default shall not constitute a waiver of any subsequent defaults but shall be restricted to the default so waived.

8.  If any part of this Agreement is determined to be contrary to any law or otherwise defective, then the other provisions of this Agreement shall not be affected thereby, but shall continue in full force and effect. If the effective interest rate, late charges, fees or expenses in connection with any indebtedness hereunder exceeds the maximum lawful amount, then the amount of such item shall be reduced to the maximum lawful amount, and the amount of any excess amount shall be applied to principal, and returned to Customer to the extent the indebtedness has been or is thereby paid in full. This application or refund process shall be Customer's sole remedy for excessive charges.

9.  No transfer, renewal, extension or assignment of any loan or Note of this Agreement or any interest hereunder or thereunder, or loss, damage, or destruction of Collateral shall release Customer from Customer's obligations hereunder. Customer hereby waives presentment, demand, protest, notice of protest, notice of non-payment or dishonor, notice of sale of Collateral or any part thereof and all benefit of valuation, appraisement, and all exemption laws now in force or hereafter passed, including stay of execution and condemnation.

10. This Agreement (which includes each Note and all addenda, schedules or other separate documents that, by their terms, are made a part hereof) constitutes the entire agreement between Customer and Bank. Bank may by written notice to Customer correct any error or complete any blank space necessary to cause this Agreement to be accurate and effective. Except to the extent provided otherwise herein, this Agreement can be modified or amended only by a written document signed by both Customer and Bank. Customer hereby authorizes and

ratifies any prior filing of a financing statement by Bank, and appoints Bank as its attorney-in-fact to affix Customer's signature to any form relating to the Collateral and to any Uniform Commercial Code financing statement(s), to take any other action Bank deems necessary to perfect and maintain perfection of the security interests provided herein or as may be required hereby and to do all other acts and things necessary to carry out the intent of this Agreement. Customer further appoints Bank as Customer's attorney-in-fact for Customer and in its name, place and stead (i) if any of the Collateral is covered by a certificate of title, for the sole and limited purpose of endorsing in its behalf any necessary forms required to apply for or transfer title and/or indicate Bank's security interest on the certificate of title as contemplated under this Agreement, (ii) to endorse the name of Customer to instruments and documents for purposes of collection or expedition, (iii) in obtaining payment, adjusting, canceling or settling any claims upon or under any insurance policies covering the Collateral, and hereby authorizes Bank to endorse the name of Customer on any checks, drafts or other instruments received or given in payment or liquidation of any claim under any such insurance policy, and (iv) to perform each and every act Bank deems necessary in connection with this power of attorney. Customer further authorizes Bank to execute a power-of-attorney form in Customer's name if and to the extent necessary or convenient to confirm the foregoing grant of authority. The foregoing powers of attorney are coupled with interests in the underlying subject matter and are therefore irrevocable. Bank may assign this Agreement at any time. Customer may not assign its rights or delegate its duties under this Agreement without the express prior written consent of Bank.

11. With respect to any disputes between the parties, any proceeding by Bank against Customer may be brought by Bank in a court of competent jurisdiction located in the County of St. Joseph, State of Indiana (which court shall have jurisdiction to hear such matters) and Customer hereby irrevocably consents and submits itself to jurisdiction in any such court. Customer consents to service of process by first-class mail or messenger directed to Customer at Customer's address set forth above. Nothing herein affects or limits the rights of Bank to serve legal process in any other manner permitted by law or the rights of Bank to bring any action or proceeding against Customer or its property in courts of any other jurisdiction. Customer waives any bond or surety or security upon such bond or surety that might, but for this waiver, be required of Bank. Due to the complexity, high cost and time involved in commercial litigation before a jury, Customer and Bank each knowingly, voluntarily, irrevocably, and after the opportunity to consult with respective counsel, without coercion, waives any and all rights to trial by jury of any disputes between them and further waives any right to consolidate, by counterclaim or otherwise, any action or proceeding concerning any dispute between them with any other action or proceeding in which there is a trial by jury or in which a jury trial cannot be or has not been waived. Nothing herein shall affect Bank's right before, during or after commencing proceedings for court enforcement of its rights hereunder to exercise self-help remedies, such as repossession or set-off under the Uniform Commercial Code or other applicable law, convention or treaty, including Bank's right to bring an action in any court of competent jurisdiction for the purpose of enforcing any self-help remedies. This Agreement, together with each Note and Bank's interests in the Collateral, shall be governed in all respects by the laws of the State of Indiana (without regard to conflict of law principles).

12. Any notice or other communication given under this Agreement must be in writing and be delivered to the recipient party. Notices to Customer shall be delivered personally, sent via fax, or mailed (by regular first class mail, or certified or registered mail, or by recognized overnight courier), postage prepaid to Customer at its address or fax number shown at the beginning of this Agreement. Notices to Bank shall be delivered personally or mailed (by regular first class mail, or certified or registered mail, or by recognized overnight courier), postage prepaid to Bank's address for notices: P. O. Box 783, South Bend, IN 46624 for mail; 100 North Michigan Street, South Bend, IN 46601 for overnight courier, in either case to the attention of Credit Notice Desk. The parties may give notice to designate a different address for notices to the party.

13. In addition to notices or other formal communications given under this Agreement, Customer authorizes Bank to send communications to it via fax or regular email from time to time. Although email generally is an efficient and effective means of communicating, it is not a secure means of communication. Customer acknowledges that there is risk of improper interception of sensitive, confidential or proprietary information when that information is transmitted via regular email. To mitigate such risk, Bank offers to encrypt information it sends to Customer via email or to communicate such information by secure fax or overnight delivery. Because these more secure means of transmitting information are not as convenient as regular email, Customer prefers to accept those risks rather than pursue less convenient means of communication. Accordingly, Customer (i) acknowledges its acceptance of the risks associated with regular email transmission of confidential information, and (ii) releases Bank from any claim for losses or damages as a consequence of improper interception of confidential information while in route to or from Customer via regular email.

14. A fax or other electronic reproduction of this page or any other Note, document, schedule, exhibit or attachment to this Agreement executed in connection with this Agreement with the signature of either party to this Agreement shall be as effective and valid as if such page bore the original signature of such party. This Agreement may be executed and delivered in counterparts and via fax or other electronic means. Customer acknowledges that Customer has received and retained a completed copy of this Agreement and any UCC financing statement filed or to be filed in respect of the Collateral. Customer confirms that if it has received copies of documents for execution from Bank via any means of electronic delivery (including email), that it has made no changes to such documents and the documents are identical in content to the version dispatched by Bank to Customer.

15. This Agreement shall be deemed accepted by Bank in South Bend, Indiana, by the Bank's act of funding the first loan made under this Agreement.

Executed by Customer on September 21, 2017.

CUSTOMER: MINNIE MOORE RESOURCES, INC.

Signature: _____

Printed Name and Title: Carl Johnston, President

**1st SOURCE BANK**

By: _____

Thomas Dell, Portfolio Funding Manager

**51 Source. Bank**

App No. 4630393

9922100066351-
U6353

## PROMISSORY NOTE – Term

| | |
|---|---|
| *Customer hereby irrevocably instructs Bank to disburse the Loan proceeds as* *follows, or as otherwise specified by Customer:* $350,000.00 to Interval Equipment Solutions Inc. | Amount Advanced:    $350,000.00 <br> Fees:    $800.00 <br> Total Amount of Loan:  $350,800.00 |
| **Payment Type** <br> See Exhibit A | **Interest Rate** <br> Fixed Rate: 4.79% per annum. |
| First Payment Due Date: October 30, 2017 | **Comments:** |
| Loan Due Date:    September 30, 2021 | |

1.  This Promissory Note ("Note") is executed and delivered pursuant to the Loan and Security Agreement dated September 21, 2017 ("Agreement") between MINNIE MOORE RESOURCES, INC. ("Customer") and 1st Source Bank ("Bank"). This Note memorializes a "loan" as defined in and made under the Agreement. All terms that are capitalized in this Note which are not otherwise defined in this Note shall have the meanings ascribed in the Agreement. This Note is secured by, and subject in all respects to, the terms and conditions contained in the Agreement, all of which are incorporated by reference into this Note. These terms and conditions cover, among other things, events and circumstances that constitute a default by Customer, and Bank's rights and remedies in respect of a Customer default. This Note is secured by Collateral as provided in the Agreement, and in particular by the Collateral described in the specific Collateral Schedule attached to this Note.

2.  Customer promises to pay to Bank or to Bank's order, at such office as Bank may direct, the unpaid principal balance of this Note and all other sums which become due under the Loan Agreement, with interest commencing on the Loan Funding Date at the Interest Rate per annum specified herein, according to the Payment Schedule described above. The entire balance due under this Note is due and payable in full on the Loan Due Date.

3.  This is a "term" loan, and is not a revolving credit arrangement. Customer has no right to receive a re-advance in the future of loan proceeds due to payments or other principal reductions in this Note. If the Total Amount of Loan shown above is not fully disbursed at the Loan Funding Date, then Bank reserves the right to decline to make any further disbursement after 180 days from the Loan Funding Date or if a default (as defined in the Agreement) exists. If Bank makes any further disbursements, then, for each disbursement, Bank may recompute the amortization and repayment schedules and notify Customer of the recomputed payment schedule.

4.  Customer may prepay the entire unpaid principal balance of the Loan applicable to any item or items of Equipment at any time. Any prepayment of principal that is a direct result of Customer selling or otherwise disposing, other than to an affiliated company, of the item(s) in the ordinary course of Customer's business to which Bank has consented ("ordinary course prepayments") shall not be subject to any early breakage fee. If Customer makes a prepayment other than an ordinary course prepayment (including a payment of principal due after acceleration of the Loan following default), Customer shall also pay Bank an early breakage fee to compensate Bank for actual and potential loss of return on prepaid amounts and for costs associated with processing prepayments. The early breakage fee shall be equal to one percent (1%) per annum of the amount prepaid for each year (and for any partial year, which shall be rounded up to a whole year) remaining in the scheduled term of the Loan, measured from the date of prepayment. Partial prepayments shall be applied against payment installment obligations in inverse order of maturity unless the Bank agrees in its sole discretion to recalculate the required installment payments by spreading the remaining unpaid principal balance over the remaining term of the Loan resulting in a recast schedule of installment payments having due regard for the interest specified for the Loan. If so, Bank will notify Customer of the recast schedule.

Executed by Customer on September 21, 2017

CUSTOMER: MINNIE MOORE RESOURCES, INC.

Signature: _____

Printed Name and Title: Carl Johnston President

BANK USE ONLY:
Loan Funding Date: September 25, 2017

Promissory Note Term 12-16-2013                    Page 1 of 2

<span style="color:red">Exhibit "B"</span>

MINNIE MOORE RESOURCES, INC.
EXHIBIT A

The following collateral is financed for a period of forty-eight (48) months at a rate of 4.79% for the Amount Advanced $350,000.00 plus Fees $800.00 for a Total Amount of Loan of $350,800.00.

| Unit | Serial Number | Value | Payment | Due Date |
|---|---|---|---|---|
| Grizzly Screen | RT-17-0801 | $17,640.00 | 47 @ 411.21 P&I; 1 @ Remaining P&I | 10/30/17 09/30/2021 |
| Extec C12+ Track Mounted Jaw Crushing Plant | 11899 | $237,360.00 | 47 @ 5,456.88 P&I; 1 @ Remaining P&I | 10/30/17 09/30/2021 |
| Extec S-5 Track Mounted Screening Plant | 9520 | $95,000.00 | 47 @ 2,187.72 P&I; 1 @ Remaining P&I | 10/30/17 09/30/2021 |

**All payments above consist of principal and interest on the entire principal balance at the Interest Rate, commencing on the above due dates and then payable on the same day of each succeeding month continuing until the number of payments set forth above have been made. The final payment consists of the outstanding balance including principal, interest, and any other unpaid monetary obligations of Customer to Bank.

**1st Source Bank**

Retail/Owner/Operator
App No. 4630393

## SCHEDULE "A"

This Schedule A becomes a part of the Loan and Security Agreement dated September 21, 2017 ("Agreement") between MINNIE MOORE RESOURCES, INC. ("Customer") and 1st Source Bank ("Bank") by Customer's act of requesting funding and Bank's act of advancing funds in respect of the property described below, which property shall be included as "Equipment" in the "Collateral" (as defined in the Agreement).

1.  The equipment listed below is included as Equipment:

    Grizzly Screen s/n RT-17-0801
    Extec C12+ Track Mounted Jaw Crushing Plant s/n 11899
    Extec S-5 Track Mounted Screening Plant s/n 9520
    To include but not limited to; all electrical boxes, controls, cabinets, wiring, cable, transformers, lights, meters, soft starts, stops, pipe, pumps, and any and all electrical components necessary to operate the equipment /conveyors above

2.  The Equipment shall be used primarily for business or commercial use other than farming.

3.  Customer will not sell, lease or transfer ownership or possession of any of the Equipment to another person without Bank's prior written consent.

4.  Customer confirms and agrees that (check applicable box):
    ☐ Customer has inspected and accepted the Equipment as satisfactory in all respects
    ☐ Delivery of the Equipment is pending, and currently scheduled for  *Friday Sept 22 2017*

5.  Note: If the Equipment is subject to a certificate of title statute, Customer is responsible for applying for certificates of title with Bank's lien noted thereon within ten (10) days from the date these units are financed by Bank.

---

*BANK USE ONLY*

Loan Funding Date: September *25* 2017

APPROVAL/INITIALS
*TO*

---

**1st Source Bank**

## GUARANTY OF PAYMENT

1. In reliance on and subject to the undersigned ("Guarantor") entering into and delivering this Guaranty of Payment ("Guaranty"), 1st Source Bank ("Bank") has agreed, and may from time to time in the future agree, to extend financial accommodations to MINNIE MOORE RESOURCES, INC. ("Customer"). Guarantor is affiliated or otherwise associated with Customer and such financial accommodations are of direct and significant benefit to Guarantor and Customer.

2. The term "Obligations" means all existing and future indebtedness, liabilities and obligations of every kind, nature and description which are at any time owed to Bank by Customer, whether direct or indirect, absolute or contingent, and whether now due and owing or hereafter due and owing from time to time, including all existing and future indebtedness evidenced by any promissory note(s), loan agreement(s) or lease(s) now or hereafter executed and delivered by Customer to Bank and any and all renewals, extensions or modifications thereof.

3. Guarantor unconditionally guarantees to Bank the full and prompt payment and performance when due of all Obligations due and to become due to Bank. Bank shall have the right to apply all amounts received hereunder, in such amounts and in such proportions as Bank in its sole discretion shall determine, to the costs and expenses of enforcement and collection and to the full or partial satisfaction of the Obligations.

4. This is a guarantee of payment and not of collection. Bank shall have immediate recourse against Guarantor and shall not be obligated to take any steps or otherwise attempt to enforce the Obligations by other available means prior to pursuing recourse against and obtaining payment from Guarantor (although Bank may do so, in whole or in part, at its sole option).

5. Guarantor's liability hereunder shall be absolute and unconditional, and nothing except final and full performance of all of the Obligations shall operate to discharge such liability. Accordingly, Guarantor unconditionally and irrevocably waives each and every defense under applicable law that would otherwise operate to impair or diminish the liability of Guarantor hereunder. Without limiting the generality of the foregoing waiver, Guarantor agrees that none of the following acts, omissions, or occurrences shall diminish or impair the liability of Guarantor hereunder in any respect (all of which acts, omissions or occurrences may be done without notice to Guarantor): (a) any extension, modification, indulgence, compromise, settlement, or variation of any of the terms of the Obligations; (b) the discharge or release of Customer or of any other person now or hereafter liable on the Obligations; (c) the avoidance or impairment of any collateral securing the Obligations by reason of bankruptcy or insolvency laws or otherwise; (d) the acceptance or release by Bank of any collateral or any other guaranty, or any settlement, compromise or extension with respect to any collateral or other guaranty; (e) the application or allocation by Bank of payments, collections, or credits on the Obligations; (f) the creation of any new Obligations; and (g) the making of demand, or absence of demand, for payment of the Obligations, or giving, or failing to give, any notice of dishonor or protest, or any other notice. Guarantor further unconditionally and irrevocably waives: (a) all rights Guarantor may have, at law or in equity, to seek or claim subrogation, contribution, indemnification, or any other form of reimbursement from Customer by virtue of any payment(s) made to Bank under this Guaranty or otherwise until the Obligations shall have been fully and finally paid; (b) any acceptance of this Guaranty; (c) any set-offs or counterclaims against Bank which would impair or affect Bank's rights against Guarantor; (d) any notice of the disposition of any collateral securing the Obligations and any right to object to the commercial reasonableness of the disposition of any such collateral; and (e) any defenses related to the validity or enforceability of any documentation executed by Customer or by Guarantor in connection with the Obligations.

6. If Bank at any time is required to return or restore to Customer or to any trustee in bankruptcy, any payment(s) made upon the Obligations, this Guaranty shall continue in full force and effect or shall be fully reinstated, as the case may be, and Guarantor's obligation to Bank hereunder shall be increased by the amount of any such payment(s) as Bank shall be obliged to return or restore, plus interest thereon at the "Default Rate", if any, specified in Customer's agreement with Bank applicable to any such payment(s) (and if no Default Rate is defined, then at the rate otherwise provided in such Customer's agreement) from the date(s) the payment(s) upon the Obligations was originally made.

7. Guarantor shall indemnify and hold Bank harmless from and against any and all costs, fees and expenses including, without limitation, reasonable attorneys' and other professional fees, in connection with Bank's defending any preference or fraudulent conveyance claim or action brought against Bank in any bankruptcy or other proceeding concerning Customer. Guarantor also shall pay to Bank, or if requested by Bank, directly to the applicable vendor or other third party, any fees, costs or expenses incurred by Bank in connection with this Guaranty or the Obligations, including, without limitation, fees, costs or expense of (i) exercising its rights herein or under applicable law to protect its interest in any collateral by performing any obligations of Customer or Guarantor in the event Customer or Guarantor fails to timely perform same, and (ii) all attorneys' and other professionals retained by Bank in connection with any of the foregoing, or any exercise of other remedies upon occurrence of a default whether such fees, costs or expenses are incurred before or after commencement of any bankruptcy case or other insolvency proceeding. All of the foregoing fees, costs or expenses thus incurred or expended by Bank, and any other monies paid by Bank to collect the Obligations or protect its interests in any collateral shall, at Bank's option, for each instance of fees, cost or expense so incurred or paid by Bank, either be added to the balance of the Obligations and be subject to all of the provisions of this Guaranty, or be paid immediately by Guarantor upon demand by Bank, with interest accruing on the amount so demanded at the "Default Rate", if any, specified in Customer's agreement with Bank applicable to any such payment(s) (and if no Default Rate is defined, then at the rate otherwise provided in such Customer's agreement).

8. Guarantor represents and warrants to Bank that all financial statements Guarantor has delivered or will deliver in the future are and will be true and correct in all material respects as of the date of such statements and that there has been or will be no material adverse change in the financial condition of Guarantor from the date of such statements to the date of delivery of such statement(s) to the Bank. Guarantor acknowledges that in accepting this Guaranty, Bank has relied upon Guarantor's previously delivered financial statements and Guarantor's agreement to provide the Bank with Guarantor's current financial statements in the future. Guarantor agrees to deliver Guarantor's financial statement(s) as to a Guarantor that is an entity, within 120 days after each fiscal year end, together with the opinion or other report of the accountant(s) (if any) retained to compile, review or audit the financial statements, and (b) as to a Guarantor who is an individual, at such intervals as may be required so that the age of the most current financial statements on file with Bank (based on the "as of" date of the financial statements) is not greater than 15 months. Bank may also request updated financial statements on thirty (30) days' notice. The financial statements to be delivered must be in the same form and type as originally submitted with Customer's loan request, or in such other form as Bank may reasonably require. Bank may specify a different form, type or frequency for Guarantor's financial statements in any addendum, schedule or other separate document that, by its terms, is made a part hereof, or as Bank may reasonably request in any written notice delivered to Guarantor by Bank. Guarantor will on Bank's request deliver to Bank true and accurate copies of its federal and state income tax returns. Guarantor further warrants that the assets disclosed in Guarantor's financial statements are owned solely by Guarantor, and that none of Guarantor's disclosed assets have been placed in a trust which is not also a guarantor of the Obligations. Until the Obligations are paid in full, Guarantor will not without Bank's prior written consent make any voluntary transfer of any of Guarantor's assets into a trust or otherwise which would have the effect of materially diminishing Guarantor's present net worth.

9. Guarantor hereby releases Bank from any and all claims, harm, injury, and damage of any and every kind, known or unknown, legal or equitable, other than those which arise from the gross negligence of Bank, which Guarantor has against the Bank from the date of Customer's first contact with Bank until the date of this Guaranty. Guarantor agrees to give Bank written notice of any action or inaction by Bank or any agent or attorney of Bank in connection with the

Exhibit "C"

Obligations or this Guaranty that may be actionable against Bank or any agent or attorney of Bank or a defense to payment of the Obligations or this Guaranty, including without limitation, commission of a tort or violation of any contractual duty or duty implied by law. Guarantor hereby agrees that unless such notice is delivered to Bank as promptly as possible (and in any event within thirty (30) days) after Guarantor has knowledge, or with the exercise of reasonable diligence, should have had knowledge, of any such action or inaction, Guarantor shall be deemed to have waived any such claim or defense.

10.   If any part of this Guaranty is determined to be contrary to any law or otherwise defective, then the other provisions of this Guaranty shall not be affected thereby, but shall continue in full force and effect.

11.   This Guaranty shall inure to the benefit of every holder of any of the Obligations. If any person other than Bank shall become a holder of any of the Obligations, then each reference to Bank shall be construed to refer to each such holder.

12.   This Guaranty shall continue in effect until Guarantor delivers to the Bank thirty (30) days advance written notice of termination. However, this Guaranty shall continue in full force and effect after such notice of termination with respect to all Obligations in existence on the effective date of such termination (including all unadvanced lines of credit, extensions and renewals of Obligations and all subsequently accruing interest and other charges thereon) until all such Obligations are fully and finally satisfied.

13.   This Guaranty constitutes the entire agreement between Guarantor and Bank and includes all oral or written agreements, representations, warranties, covenants, and communications between Guarantor and Bank and their respective agents and employees. This Guaranty can be modified or amended only by a written document signed by Guarantor and Bank.

14.   Any ambiguity in this Guaranty will not be construed against Bank as the drafter of such language or otherwise. Guarantor has carefully and completely read all of the terms of this Guaranty and has been given the opportunity to consult with counsel and other advisors of his, her or its choice. Guarantor is not relying on the opinions or advice of Bank or its agents or representatives in entering into this Guaranty.

15.   With respect to any disputes between the parties, any proceeding by Bank against Guarantor may be brought by Bank in a court of competent jurisdiction located in the County of St. Joseph, State of Indiana (which court shall have jurisdiction to hear such matters) and Guarantor hereby irrevocably consents and submits itself to jurisdiction in any such court. Guarantor consents to service of process by first-class mail or messenger directed to Guarantor at Guarantor's address set forth below. Nothing herein affects or limits the rights of Bank to serve legal process in any other manner permitted by law or the rights of Bank to bring any action or proceeding against a Guarantor or its property in courts of any other jurisdiction. Guarantor waives any bond or surety or security upon such bond or surety that might, but for this waiver, be required of Bank. Due to the complexity, high cost and time involved in commercial litigation before a jury, Guarantor and Bank each knowingly, voluntarily, irrevocably, and after the opportunity to consult with respective counsel, without coercion, waives any and all rights to trial by jury of any disputes between them and further waives any right to consolidate, by counterclaim or otherwise, any action or proceeding concerning any dispute between them with any other action or proceeding in which there is a trial by jury or in which a jury trial cannot be or has not been waived. Nothing herein shall affect Bank's right before, during or after commencing proceedings for court enforcement of its rights hereunder to exercise self-help remedies, such as set-off under applicable law, including Bank's right to bring an action in any court of competent jurisdiction for the purpose of enforcing any self-help remedies. This Guaranty shall be governed in all respects by the laws of the State of Indiana (without regard to conflict of law principles).

16.   Any notice or other communication given under this Guaranty must be in writing and be delivered to the recipient party. Notices to Guarantor shall be delivered personally, sent via fax, or mailed (by regular first class mail, or certified or registered mail, or by recognized overnight courier), postage prepaid to Guarantor at its address or fax number shown below. Notices to Bank shall be delivered personally or mailed (by regular first class mail, or certified or registered mail, or by recognized overnight courier), postage prepaid to Bank's address for notices: P. O. Box 783, South Bend, IN 46624 for mail, 100 North Michigan Street, South Bend, IN 46601 for overnight courier, in either case to the attention of Credit Notice Desk. The parties may give notice to designate a different address for notices to the party.

17.   In addition to notices or other formal communications given under this Guaranty, Guarantor authorizes Bank to send communications to it via fax or regular email from time to time. Although email generally is an efficient and effective means of communicating, it is not a secure means of communication. Guarantor acknowledges that there is risk of improper interception of sensitive, confidential or proprietary information when that information is transmitted via regular email. To mitigate such risk, Bank offers to encrypt information it sends to Guarantor via email or to communicate such information by secure fax or overnight delivery. Because these more secure means of transmitting information are not as convenient as regular email, Guarantor prefers to accept those risks rather than pursue less convenient means of communication. Accordingly, Guarantor (i) acknowledges its acceptance of the risks associated with regular email transmission of confidential information, and (ii) releases Bank from any claim for losses or damages as a consequence of improper interception of confidential information while in route to or from Guarantor via regular email.

18.   A fax or other electronic reproduction of this page or any other document, schedule, exhibit or attachment to this Guaranty executed in connection with this Guaranty with the signature of Guarantor shall be as effective and valid as if such page bore Guarantor's original signature. This Guaranty may be executed and delivered in counterparts and via fax or other electronic means. Guarantor confirms that if it has received copies of documents for execution from Bank via any means of electronic delivery (including email), that it has made no changes to such documents and the documents are identical in content to the version dispatched by Bank to Guarantor.

Executed by Guarantor on September 21, 2017.

Address for Notices:

3154 SORRELL ST
LAS VEGAS, NV 89146

CARL JOHNSTON                                president